## In re OVAL WOOD DISH CORPORATION.
### No. 23201.

District Court, N. D. New York.
Aug. 24, 1936.

year an additional 400 men. The company saws from eight million to ten million feet of lumber per year. Part of each year's cut is sold as lumber and part is manufactured into various products, such as flooring, veneer, wooden dishes, spoons, clothes pins, etc.

The company began operation at Tupper Lake somewhere about twenty years ago. Its plant was more expensively built than construction under present money conditions would warrant. I believe that the same is true of its early operations. The First Wisconsin National Bank of Milwaukee was its financial backer. Some of the past financing charges seem to have been excessive.

Certainly, the court can take judicial notice of the fact that the lumber industry, in all branches and in all parts of the country, has, during the past few years, been "hard hit." The curtailment of sales and drop in prices, coupled with the fact that the company was not sufficiently financed, brought about a condition where it did not have working capital to carry on its operations. Relief was sought through application to R. F. C. (Reconstruction Finance Corporation) for a loan. I am advised that this application was approved for a $200,000 loan, provided the bank would subordinate its debt to the loan. This the bank refused to do.

In December, 1935, the company filed in this court under section 77B. At that time its indebtedness was approximately $12,000 to merchandise creditors for current accounts; $323,360 to the First Wisconsin National Bank of Milwaukee; $169,618.75 to Wisconsin Equities, Inc., a wholly owned subsidiary of the bank; $61,818.75 to certain stockholders of the corporation. None of this indebtedness is secured, except that the bank holds, as collateral, an insurance policy for $270,000 issued upon the life of W. C. Hull, the president of the corporation. Borrowings have been made against this policy thereby reducing its face value to approximately $212,000. Through agreement, the indebtedness owing to the Wisconsin Equities, Inc., and the stockholders was subordinated to the notes of the bank.

In January of last year, after a hearing, an order was made authorizing the continuation of the business and the borrowing upon the certificates of indebtedness, not exceeding in the aggregate $125,-

Kaufman & Weitzner, of New York City (S. H. Kaufman and David G. Haskins, both of New York City, of counsel), and Moore & Herron, of Malone, N. Y. (George J. Moore, of Malone, N. Y., of counsel), for debtor.

Charles M. Harrington, of Plattsburg, N. Y., for creditors.

BRYANT, District Judge.

The above matter is before me upon the application of debtor, pursuant to section 77B, subd. (c) (8), of the Bankruptcy Act (11 U.S.C.A. § 207 (c) (8), brought on by way of order to show cause, for an order extending the time within which a plan of reorganization may be proposed and filed to and including June 1, 1937.

The Oval Wood Dish Company is a corporation conducting extensive lumber operations in the vicinity of Tupper Lake, N. Y. Its mills and manufacturing plants, for the working up of a considerable portion of its lumber into various products, are located there. Tupper Lake is a village of about 5,000 population. The company is the only sizable manufacturing plant in the place. The number of the company's employees varies at different seasons of the year. It directly employs approximately from 75 to 375 persons. Indirectly, through jobbers and woods operations, it employs for a portion of the

000. Under this order the debtor was directed to file a plan of reorganization on or before June 1, 1936. At the time of ordering the continuing of operations, nearly all of the year's supply of logs had been cut and partially paid for. They were in the woods and would have been a total loss unless hauled and manufactured. Upon the hearing, the bank and the Wisconsin Equities, Inc., were the only creditors opposing continuation of the business. They demanded immediate liquidation, and seemed wholly unconcerned over the fact that liquidation at that time of the year would mean a large sacrifice of assets. No proposed plan has been filed.

In the latter part of May, the company made this application for an extension, to June 1, 1937, of the period within which to file a plan. Upon the hearing, the bank and Wisconsin Equities, Inc., appeared in opposition. From a study of the financial and operating statements, conference had, and testimony taken, I believe it safe to say that the company, during the period from the latter part of December until about the middle of May, made a profit of approximately $9,000. This is figured after charging off approximately $45,000 to depreciation. In figuring this profit no provision was made for interest on the indebtedness owing at the time the company filed under section 77B. If interest on this indebtedness had been charged, there would have been a substantial profit without depreciation and a small deficit with full depreciation taken. Estimated profits for the balance of the year are substantially larger. These increased estimates seem to rest upon a sound base. There cannot be any question but that, if an extension of time for filing a plan is granted and the company is allowed to continue operations, it should be allowed to continue to operate until about June next. The nature of its business makes this almost mandatory. If the company is to continue in business, it must immediately begin the cutting and skidding of logs. Most of these can be brought to the mill only during the winter season, and they cannot be manufactured into lumber before the latter part of May. Even then the lumber will have to season for awhile.

■ It is the contention of the bank and its subsidiary that the debtor has not shown any facts whereby the court can use its discretion and say there is a fair opportunity that a plan agreeable to them can, in the near future, be presented. The objectors quote with approval from In re Tennessee Pub. Co. (C.C.A.) 81 F.(2d) 463, 466, that "the purpose of the statute is to relieve distressed debtor corporations and to provide the mechanics for reorganization where reasonable expectation of continued useful existence may be fairly entertained." They admit that the court should, when dealing with corporations having "reasonable expectation" of future success, continue operations for sufficient time to enable formulation and perfection of reorganization plans. Here, however, they contend no showing of "reasonable expectations" for successful reorganization has been made and that it will be an abuse of discretion to grant an extension.

In matters such as this, the court in exercising its discretion hardly ever depends solely upon the facts contained in the record. These are usually supplemented by the court's knowledge of the industry, the future outlook of the business, a study of the financial statements of the corporation, information obtained from talks had with officers of debtor and other persons conversant with the industry, etc. The facts gathered from all such sources lead the court to the belief that there is a reasonable expectation that debtor can, in the near future, present a reorganization plan that not alone will fully protect the creditors and save the equities of stockholders, but also keep in life an industry which, if closed, will throw many families on relief and practically ruin a thriving village. The belief can be strengthened through the assurance of objections that they will co-operate. Inasmuch as they own 42½ per cent. of the stock of the company, co-operation should prove beneficial to all.

It hardly seems an abuse of discretion to allow a corporation, which is operating at a profit, an extension of time to present plans for reorganization of a business, a large portion of the assets of which will be rendered valueless through liquidation. This is further negatived by the figures and reports which seem to indicate future operating profit, over and above depreciation, will more than equal any accrual of interest.

The time for the debtor corporation to present a plan is extended until June 1, 1937. The order may contain provisions for the continuance of the business until further order of the court.

As stated before, there are insurance policies issued upon the life of the president, assigned to the bank as collateral. Since the filing under section 77B the debtor has not paid any premiums on the policies. The bank has paid the premiums and the policies are now in force. Every one connected with this matter, whether in favor of continuation of the business, or liquidation, agrees that these policies should be kept in force. The bank asks, in case the corporation is allowed to continue in business, that debtor be required to pay the premiums on these policies. The debtor states that' it cannot do so because such payment would constitute a preference in favor of the bank and against the other creditors. The Wisconsin Equities, Inc., and the stockholders, who are creditors, cannot put forth any claim of preference because they have, by agreement, subordinated their indebtedness to that of the bank. The argument may be sound as against the merchandise creditors. These creditors, as I understand, are now selling the debtor corporation and are anxious to see some plan worked out whereby the company can continue operation. More than this, the bank, in an affidavit filed in this court, has stated that if liquidation is ordered it will consent to the payment of the merchandise creditors in full. It is natural to assume that the bank will take the same attitude next summer that it now takes, provided liquidation is then ordered. If it should not, undoubtedly some protection against discrimination can be afforded the merchandise creditors. This insurance should be kept in force. It seems only fair and equitable, inasmuch as the bank is restrained from enforcing its claims, that the premiums should be paid by the debtor corporation.

The bank has requested, in case the debtor is allowed to continue in business, that the compensation of the six salaried officers and employees be reduced. All of these, whose names were read into the record at the last hearing, are not only vitally interested in the continuation of the business, but also in obtaining a successful reorganization. In order to bring this about they should be, and undoubtedly are, willing to make a sacrifice, thereby helping to bring about such a showing that outside capital may be interested. Until further order of the court, the salaries, as listed, with the exception of the salary of E. J. Weir, beginning September 1, 1936, are reduced 20 per cent. and Weir's $50 per month.

An order in accordance with this decision may be presented.